M'DONALD and Another *v.* BEACH and Another.

The doctrine—that the separate debt of one partner should not be paid out of the part-
nership estate, until all the debts of the firm are discharged—is correct; but it does
not apply until the partners cease to have a legal right to dispose of their property as
they please. It is applicable only, when the principles of equity are brought to in-
terfere in the distribution of the partnership property among the creditors.

Those equitable principles operate on the property remaining in the possession of the
partners, and embrace all that has been fraudulently disposed of; but they do not
extend to such as has been previously transferred by the firm in good faith.

ERROR to the *Clark* Circuit Court.

HOLMAN, J.—The bill, answers, and exhibits, in this case,
show that *William Steele* and *Robert Steele,* merchants and part-
ners, were indebted to the complainants in the sum of 4,043
dollars, for which they drew a bill of exchange on *Richard
Steele,* a resident of *Louisville, Kentucky,* payable on the 15th
of *December,* 1822, which was presented and accepted, as is
said, for the accommodation of the drawers, but was after-
wards protested for non-payment; and that *William* and *Robert
Steele* are insolvent. The bill also charges a further debt
against *William* and *Robert Steele* of several thousand dollars,
but of this there is no proof. It also appears that *William
Steele,* as surety for *John Wilson,* (who was insolvent), was in-
debted by a writing obligatory to the trustees of *Clarksville* to
the amount of 2,700 dollars; and that *Orlando Raymond,* as
agent for the trustees, obtained, through *William Steele,* from
*Richard Steele,* who was the agent of *William* and *Robert Steele,*
an order in the name of said firm, dated the 14th of *October,*
1822, for 280 barrels of salt, the property of said firm, which
had been shipped to *Daniel Wurts,* commission merchant of
said firm at *Jeffersonville,* for sale. This salt was obtained on
said order and deposited with the defendant *Beach;* and the
proceeds were to go towards the payment of the debt due to
the trustees. *Raymond* also obtained a draft, in the name of
*William* and *Robert Steele,* on said *Wurts* for the balance of the
debt due the trustees, dated the 26th of *October,* 1822, payable
in six months; which draft was accepted by *Wurts,* provided
he should have funds belonging to the said *Steeles,* and he pro-

May Term,
1827.

M'DONALD
v.
BEACH.

mised to retain the funds that came into his hands for that pur-
pose. In consequence of which draft, *Wurts* retained in his
hands the sum of 1,200 dollars, which was less than the amount
due the trustees. This draft was in the hand-writing of *Wil-
liam Steele;* but it does not appear that this fact was known ei-
ther to *Raymond* or the trustees. On the 10th of *November,*
1822, the trustees transferred the bond of *Wilson* and *William
Steele* to *Beach,* who was one of the trustees; and, as a collate-
ral security for the payment, they transferred to him their claim
on the 280 barrels of salt, and also the draft on *Wurts.* The
salt was afterwards sold for 1,012 dollars and 86 cents, and that
amount credited on said bond, on the first of *February,* 1823.

The complainants claim the proceeds of this salt, and the
money retained by *Wurts,* alleging that, by agreement with
*William* and *Robert Steele,* they were to have the proceeds of
all the salt shipped to *Jeffersonville,* and that this agreement
was known to *Beach* and the trustees. The answers deny all
knowledge of this agreement, and there is no evidence to sup-
port it. They also urge, that this disposition of the partner-
ship property, to pay the separate debt of *William Steele,* was
without the knowledge and consent of *Robert Steele;* and that
the trustees knew this at the time they obtained the order and
the draft aforesaid. This is denied by the answers; and there
is no proof that this arrangement was made without the know-
ledge of *Robert Steele.* It is true that *Robert Steele,* who resided
at *Kenhawa, Virginia,* wrote a letter to *Wurts,* dated the 8th
of *May,* 1823, protesting against the payment of said draft, and
stating that *he did not conceive it right for William Steele to apply
the partnership property to the payment of his separate debt.* This
letter was written after the proceeds of the salt had been cre-
dited on the bond of *Wilson* and *William Steele,* and after the
draft on *Wurts* had become due and payable. It does not ex-
pressly deny a knowledge of, and consent to, the arrangement
with the trustees; but if it is supposed to do this indirectly, its
effect is somewhat weakened by the testimony of *Raymond,* who
states that he saw *Robert Steele* in *Louisville,* in the month of
*October,* 1822, or a little after; which was about the time, or
just after, the trustees had obtained the 280 barrels of salt, and
the draft on *Wurts;* and it would seem from the deposition of
*Payne,* a notary public, that, on the 18th of *December,* 1822, he

delivered to *Robert Steele*, in *Louisville*, a notice of the protest of the bill of exchange; so that it would appear that *Robert Steele* had an early opportunity of becoming acquainted with this arrangement with the trustees.    It is further weakened by the fact that *Richard Steele*, the agent of *William* and *Robert Steele*, who gave the order for the salt, was personally bound to the complainants as acceptor of the bill of exchange, for the only debt they have proved against the firm of *William* and *Robert Steele*.  Another strong ground which the trustees had to suppose that both the partners knew of the whole transaction, was, that when *Raymond* first applied to *William Steele* for the salt, said *Steele* informed him that he would do nothing in it without consulting his partner; and about three weeks afterwards he gave the order; and that *William Steele*, who resided at *Cincinnati, Ohio*, was, in general, the active partner in relation to the salt shipped by the firm to *Jeffersonville*.  Taking these circumstances together, there seems to be strong reasons to induce a belief, that both the partners were acquainted with, and consented to, the adjustment made with the trustees; and that both partners were bound by it.   No argument is here drawn from the power that *Richard Steele*, as a general agent, had to adjust the separate debt of *William Steele*, by a disposition of the partnership funds; nor from the power that *William Steele*, as a partner, had to divert any part of the partnership property from the purposes of the firm, to pay his own debt, contrary to the will of his co-partner; for this power, in *Richard Steele*, as agent, or *William Steele*, as a partner, is not contended for.   But where no covin appears, one partner will not be considered as acting without the consent of the other; and an agent as deeply interested as *Richard Steele* was, can never be presumed to transcend his authority in behalf of strangers; when by so doing he will increase his own liability.   There is a circumstance in this case that suggests the idea, that even the complainants considered this as a legal transaction.   On the 9th of *November*, 1822, the complainants obtained an order on *Wurts*, in the name of *William* and *Robert Steele*, for the partnership funds that might be in his hands; which order was accepted by *Wurts* conditionally, to be discharged after satisfying his own demands, and the obligations he was already under on account of said firm.   Now, it is not probable that the nature

8

of this conditional acceptance was unknown to the complainants, or was withheld from the knowledge of *Robert Steele*, unless the complainants, as well as *Richard Steele*, were perfectly satisfied with what had been previously done. So that we are induced to believe that no person whatever, at this period, supposed that there was any thing illegal or fraudulent in this transaction with the trustees. And we are strengthened in the belief that this transaction was not only in good faith, but that no person supposed the contrary, from the circumstance that the adjustment was made, and the claim of the trustees transferred to *Beach*, sometime before we hear of any suspicion of the insolvency of *William* and *Robert Steele*. It is not until *December*, 1822, that we learn that they were considered doubtful at *Kenhawa*, the principal seat of their business; and not until *March*, 1823, that they were there reputed insolvent. Therefore, after examining all the circumstances of the case, we can but consider this transaction as the joint act of the firm, disposing of so much of the partnership property for the separate benefit of one of the partners.

But it is contended, that the separate debt of one partner should not be paid out of the partnership estate, until all the debts of the firm are discharged. This doctrine is correct, but it does not apply, until the partners cease to have a legal right to dispose of their property as they please. *It is applicable,* only, when the principles of equity are brought to interfere in the distribution of the partnership property among the creditors. These equitable principles operate not only on the property remaining in the possession of the partners, but embrace all that has been fraudulently disposed of; but will not extend to such as has been previously transferred in good faith. There is no ground on which we can presume that the trustees, when they made this arrangement for the discharge of their demand; or that *Beach*, when he purchased their claim; had any intention of defeating the complainants in the recovery of their debt; for it does not appear that they had any certain knowledge of its existence. They were desirous of recovering their own debt, and whether it was discharged out of the separate property of *William Steele*, or out of the partnership property of *William* and *Robert Steele*, was a matter in which they were not directly concerned. The trustees obtained posses-

OF THE STATE OF INDIANA.

sion of the salt; and of the draft on *Wurts*, and transferred their claim to *Beach*, at a time when no person, not even the complainants, seem to have supposed there was any unfairness in the transaction; and having obtained this legal advantage, it would require a strong claim, indeed, to divest them of it. The claim of the complainants is not of this nature. The only debt they have attempted to prove, arises on the bill of exchange. This was payable on the 15th of *December*, 1822. On the 9th of *November* previous, they received the conditional acceptance of their order on *Wurts*, and we presume were acquainted, at that time, with the draft in favour of the trustees; yet they permitted this arrangement to proceed undisturbed, until they filed the present bill in *November*, 1823. For the amount due on this bill of exchange, they have *Richard Steele* liable to them as the acceptor. It is true, they are not bound to resort to the acceptor of the bill, but may urge their claim upon the partnership property, when the property has not been disposed of, or the disposition is fraudulent. But where there are conflicting claims, the manner in which those claims are secured, is resorted to as a means of determining their comparative merit. So, in this case, the complainants have not the same plea for interfering with any disposition of the partnership property that they would have had, if they had no security for their demand. It should however be remembered, that the bill charges that *Richard Steele* is not able to pay the whole of their demand. On the other hand, his entire ability to pay the whole is asserted by the answers; and no proof is adduced on the subject. The answers also state, that the complainants have instituted suit against him, and have stayed the proceedings until this suit is determined; and that this suit is prosecuted for his benefit: so the presumption is, that the complainants have ample security for their debt. In thus stating the merits of the complainants' demand, we do not contrast it with the demand of the trustees, on the ground that the trustees had originally any claim on the partnership property, but on the ground that they have received a legal claim to, and possession of, a part of the partnership funds, and at a time when the partners had entire control over their property; and our object is to show, that if any claim could be strong enough to defeat the

May Term,
1827.

M'DONALD
v.
BEACH.

claim of the trustees, that the complainants have not made out such a claim.

But it is urged, that if the complainants have not shown themselves entitled to divest the defendants of these funds, on account of their having security for their debt; yet that *Richard Steele*, as he has to discharge this bill of exchange, which it is said was accepted for accommodation only, should be considered as a creditor of the said firm; and that the arrangement with the trustees should be set aside in his favour. But, when his agency in this business is considered, it is impossible to suppose that the trustees have committed a fraud against him, or have taken any undue advantage of him.

We have, throughout this case, considered *Beach* in the same situation as the trustees of *Clarksville*, as he was a member of that corporation, and was individually apprised of the nature of the securities he obtained with the transfer of the demand of the trustees; so that it is unnecessary to investigate a question that has been stirred, whether he has paid the full consideration to the trustees for their claim. He is entitled at all events, as far as the complainants and *Richard Steele* are concerned, to all the advantages that could be claimed by the trustees. And we see nothing in the case, thus far, to authorise a Court of equity to rescind the contract with the trustees, or to divest *Beach* of any legal advantage he has obtained.

There is another feature of the complainants' case that merits some attention. A written agreement was entered into on the 9th of *November*, 1822, between *William Steele* and *Beach*, by which *William Steele* was to furnish *Beach* with a quantity of salt at a stipulated price, sufficient, with what salt he had received, to pay off the demand of the trustees: *The salt to be delivered in ten days, and the order on Wurts to be given up.* It does not appear that either part of this agreement was fulfilled. The salt was not delivered, nor the order given up. *Beach* in his answer states, that the order was not to be given up until the salt was delivered. But the complainants contend, that, according to the agreement, the order was to be given up unconditionally; and that no condition can be annexed to it by parol. This agreement is not a deed, and what right *William Steele* might have had under it to demand this order, before the failure to comply with the agreement on his part, need not

now be inquired into; for the failure to deliver the salt, presents a total failure of the consideration on which the order was to be given up. So that neither law nor equity would require *Beach* to deliver up the order. This circumstance, therefore, cannot affect the case of the complainants. Their bill was correctly dismissed by the Circuit Court.

*Per Curiam.*—The decree is affirmed with costs.

*Dewey* and *Nelson*, for the plaintiffs.
*Howk*, for the defendants.