SICKMAN ET AL. V. ABERNATHY ET AL.

SAME V. HAX.

1. TRANSFER OF STOCK IN TRADE BY INSOLVENT FIRM — RATIFICATION BY CREDITORS.— Where an insolvent firm has transferred all its property, taking notes in payment, its creditors, who have not sought to have the sale set aside, but have acquiesced in it, and treated it as legitimate, by proceeding against the purchasers by attachment for the money supposed to be due on the notes, cannot question the *bona fides* of the sale.

2. VALIDITY OF PAYMENTS MADE BY PURCHASERS OF STOCK CANNOT BE QUESTIONED COLLATERALLY.— Nor can they in such proceeding attack the validity of payments made by the purchasers, though the latter had knowledge of the firm's indebtedness, since there is no privity between them and the purchasers.

3. RIGHT OF PARTNERSHIP FIRM TO CONTRACT AS TO MANNER OF PAYMENT OF NOTES TO BECOME DUE IT ON SALE OF ITS EFFECTS.— In such proceeding, evidence as to contracts between the firm and the purchasers, as to the application on notes of accounts due the firm by the partners individually, and assigned to the purchasers with the other firm accounts, is immaterial, since the parties had a right to make any contract they chose as to the mode of paying the notes.

4. CREDITOR'S LIEN ONLY EXISTS WHEN PROPERTY IS IN CUSTODIA LEGIS.— No creditor's lien can attach to the partnership assets of an insolvent firm until they have been brought into the custody of the law by the interposition of the court.

5. BONA FIDE PURCHASERS NOT LIABLE TO GARNISHMENT AFTER PAYMENT OF PURCHASE MONEY.— The right of a creditor to garnish property, effects, etc., of a debtor, in the possession and charge, or under the control, of a third person, under General Statutes, section 1554, does not apply as against purchasers, without fraud, of the property of an insolvent partnership, who have paid the purchase money.

*Appeals from District Court of Larimer County.*

IN October, 1881, Alonzo P. Sickman and S. B. Livingston formed a partnership for transacting a mercantile business; were equal partners; only continued in business until about the 4th day of February following, when the firm of Livingston & Sickman sold to Jonathan Sickman (father of A. P. Sickman) and T. H. Davy, and by bill of sale assigned and transferred to them, the entire stock of goods then on hand, book-accounts, credits and good-will, for the sum of $15,000, and received in payment three notes, of $5,000 each, made by Sickman & Davy, due, respectively, sixty, ninety and one hundred and twenty days after date. Livingston & Sickman at the time of the sale were badly in debt, if not insolvent. Immediately upon commencing business, or very shortly afterwards, Sickman & Davy commenced to pay the $15,000 for which the notes were given, without regard to the time of their maturity. Such payments were made upon the orders of Livingston & Sickman, and paid either in cash or by substituting the paper of Sickman & Davy for that of Livingston & Sickman. At the time of the purchase by Sickman & Davy, A. P. Sickman was indebted to the Poudre Valley Bank for $2,000 for money borrowed, for which the bank held his note, which, with interest, amounted to $2,083, on April 19, 1882, at which time it was paid by Sickman & Davy at the request of Livingston & Sickman, and a credit given for the amount upon one of the $5,000 notes of Sickman & Davy.

Among the accounts standing upon the books of the old firm at the time of the sale which were assigned to Sickman & Davy was a personal account of A. P. Sickman, due the firm of Livingston & Sickman, of $827.16; one of S. V. Livingston, $665.43; and another of Livingston, called the "house account," of $1,066.99,—Livingston's two amounting to $1,732.42; also, an account against one L. W. Welch of $409.22, against which Welch

had a set-off for the full amount, which did not appear upon the books. These several accounts, amounting to $2,968.80, together with a bill of goods, amounting to $254.78, bought by Livingston from Sickman & Davy after the transfer, making in the aggregate over $3,000, were, by the mutual agreement of Livingston and A. P. Sickman with Sickman & Davy, indorsed as credits upon the notes of the latter. These being the payments over which the controversy arose, others need not be noticed.

About the 1st of March, 1883, appellees Abernathy and Hax, respectively, commenced proceedings by attachment against Livingston and A. P. Sickman for sums due them for goods sold, and Jonathan Sickman and Davy were served as garnishees. They having answered that they were not indebted, the answers were traversed.

After trials had been had in the county court, appeals were taken to the district court, a trial had by jury, resulting in favor of the garnishees, which verdict was set aside by the court. In March, 1885, another trial was had, resulting in finding the garnishees indebted to Livingston & Sickman in the sum of $3,123.44. From these judgments, appeals were taken to this court.

Errors are assigned upon the giving by the court of the third, fourth, seventh, eighth, ninth, tenth, eleventh, twelfth and thirteenth instructions on the part of plaintiffs, and upon the refusal of the court to give two instructions asked by garnishees.

Messrs. BALLARD, ROBINSON & LOVE, for appellants.

Messrs. HAYNES, DUNNING & ANNIS, for appellees.

REED, C. At the time the suits by attachment against Livingston & Sickman, and the proceeding by garnishment of Sickman & Davy, were commenced, the three notes of the latter, which were negotiable, had been paid to the satisfaction of the payees, delivered up to the mak-

ers, and the whole transaction closed. Section 12, chapter 46, General Statutes, 520, is as follows:

"No person shall be liable as a garnishee by reason of having drawn, accepted, made or indorsed any negotiable instrument, when the same is not due in the hands of the defendant at the time of service of the garnishee summons, or the rendition of the judgment."

This might, perhaps, be considered as concluding this case, when applied to the facts, if our construction of it is correct; but the learned and experienced judge before whom the case was tried does not seem to have so considered it. Neither did the counsel. The importance of the case seems to render a full discussion of the questions presented necessary.

At the time of the sale and transfer of the assets of the defendants to the garnishees, the attendant circumstances and relation of some of the parties were such, perhaps, as to raise a doubt in regard to the honesty of the transaction sufficient to have caused an investigation by the creditors, which might have been had under proper proceedings; and, if found fraudulent, the sale could have been set aside, and the entire property in the hands of Sickman & Davy subjected to the payment of the debts, or, if found best, the sale could have been affirmed, and provision made for the application of the entire proceeds to the payment of the debts. But no such course was taken. The creditors, instead of questioning the honesty of the sale, acquiesced, treated it as legitimate, and elected to proceed against the purchasers for money supposed to be due. By the course pursued, the sale and transfer of the assets of the firm to the garnishees was ratified. There are numerous authorities in support of this proposition. In *Bishop v. Trustees of Hart*, 28 Vt. 75, it is said:

"By instituting this suit to recover the avails of the property assigned, and therein charging them as trustees under the assignment, they have not only ratified the

assignment itself, but also any disposition of the property which may have been made by the trustees under it. The plaintiffs will not be at liberty after that to question the legality of any transfer of the property which the trustees may have made."

After having acquiesced in the sale, and by failing to institute proper proceedings, and by instituting this suit, having ratified the sale, it is clear the creditors could not challenge the *bona fides* of the transaction, nor impeach it for fraud. Neither could they attack collaterally, on the proceeding against the garnishees, the validity of the payments made. To have enabled them to successfully attack it, there must have been some privity existing between the creditors and garnishees; otherwise, the transaction, being one they had affirmed, rested entirely with the parties to the purchase and sale. A knowledge of the indebtedness of the old firm, of itself, imposed upon the purchasers no obligation, either legal or moral, in regard to the application of the funds. Such obligation could only be imposed by contract, or by the intervention of legal proceedings. Unless creditors intervened by proper suits while an indebtedness existed, the garnishees could not be affected by the question of solvency or insolvency of the parties, or their own knowledge, or want of knowledge, on that subject. An individual or firm may be notoriously insolvent, and yet, as long as they are unrestrained at law by legal proceedings, can continue to do business as if absolutely solvent. A purchaser can take good title to any property purchased, and discharge his indebtedness in any agreed manner.

There was evidently a misconception by the court in regard to the law applicable to the case. As before stated, previous to the closing of the transactions between the old firm and the new one, no suit was instituted. There are two propositions of law necessary to be discussed in this connection: *First*, until a court interposed, and the assets of the firm were in the custody of the law, there

could be no creditors' lien upon partnership assets, as supposed by the court; *second*, previous to intervention and custody of assets by the court, the right to have firm assets applied to the payment of firm debts in preference to those of the individual debts of the partners was one that pertained to the firm, and individuals composing the firm, and in no wise pertains to the creditors of the firm.

In *Case v. Beauregard*, 99 U. S. 119, it is said: "So long as he * * * (the partner) retains an interest in the firm assets as a partner, a court of equity will allow the creditors of the firm to avail themselves of his equity, and enforce through it the application of those assets, primarily, to payment of the debts due them, whenever the property comes under its administration. It is indispensable, however, to such relief, when the creditors are, as in the present case, simple contract creditors, that the partnership property should be within the control of the court, and in the course of administration, brought there by the bankruptcy of the firm, or by an assignment, or by the creation of a trust in some mode. This is because neither the partners nor the joint creditors have any specific lien, nor is there any trust that can be enforced until the property has passed *in custodia legis*."

This case was followed by another between the same parties in 101 U. S. 688, where the decision was re-affirmed. This was followed by *Fitzpatrick v. Flannagan*, 106 U. S. 648, where nearly the identical question involved in this case was presented. In that the court below instructed the jury as follows: "If you shall find from the evidence that the defendant sold or transferred any of the property or assets of the late firm of Fitzpatrick Bros. with intent to prevent the creditors of the firm of Fitzpatrick Bros., or any of them, from collecting their debts, such sale or disposition will sustain this ground of attachment. It was the duty of the defendant, as such surviving partner, to apply all of the assets of the firm to the payment of the debts due by the firm; and, if he

appropriated any part of them to the payment of his individual debts, it was a fraud upon the firm creditors, whether he so considered it or not, and, if established by the proof, will sustain this ground of attachment, as the law will presume that he intended the natural result of his act."

In the opinion of the court the learned Justice Matthews (since deceased) said: "It is fair to consider this charge, although not so qualified, in connection with the facts, in reference to which there was evidence that the firm of Fitzpatrick Bros. and its individual members were insolvent, in the sense of not being able to pay their debts, during the whole period of its existence, and the additional fact that the deceased partner had before his death drawn from the partnership more than his interest therein, and was indebted to the firm. The legal right of a partnership creditor to subject the partnership property to the payment of his debt consists simply in the right to reduce his claim to judgment, and to sell the goods of his debtors on execution. His right to appropriate the partnership property, specifically, to the payment of his debt, in equity, in preference to creditors of an individual partner, is derived through the other partner, whose original right it is to have the partnership assets applied to the payment of partnership obligations; and this equity of the creditor subsists as long as that of the partner through which it is derived remains;"—and, after quoting the paragraph above cited, from *Case v. Beauregard*, proceeded to say: "Hence it follows that 'if, before the interposition of the court is asked, the property has ceased to belong to the partnership, if by a *bona fide* transfer it has become the several property either of one partner or of a third person, the equities of the partners are extinguished, and consequently the derivative equities of the creditors are at an end.'"

Further, speaking of *Case v. Beauregard*, he said: "In that case it was held, in respect to a firm admitted

to be insolvent, that transfers made by the individual partners of their interest in the partnership property converted that property into individual property, terminated the equity of any partner to require the application thereof to the payment of the joint debts, and constituted a bar to a bill in equity filed by a partnership creditor to subject it to the payment of his debt; the relief prayed for being grounded on the claim that these transfers were in fraud of his rights as a creditor of the firm,"—and then cited with approval the case of *Schmidlapp v. Currie*, 55 Miss. 597, where it is said: "The doctrine that firm assets must first be applied to the payment of firm debts, and individual property to individual debts, is only a principle of administration adopted by the courts where, from any cause, they are called upon to wind up the firm business, and find that the members have made no valid disposition of, or charges upon, its assets. Thus where, upon the dissolution of the firm by death or limitation or bankruptcy, or from any other cause, the courts are called upon to wind up the concern, they adopt and enforce the principle stated; but the principle itself springs alone out of the obligation to do justice between the partners."

"In that case, one of two partners, but with the assent of the other, and without any fraudulent intent, transferred the whole business and stock of the firm to a third person in payment of an individual debt. A creditor of the partnership sued out a writ of attachment against them, and caused it to be levied on the goods in the possession of the purchaser, upon the ground that the transfer of the firm goods in satisfaction of the individual debt of one of the partners was fraudulent and void as against firm creditors;" and it was held that an attachment would not lie.

The learned justice, in *Fitzpatrick v. Flannagan*, *supra*, after stating that the same principle applied in cases of dissolution, whether voluntary or by the death

of a partner, proceeded to say: "And unless a partnership creditor, or the personal representatives of the deceased partner, commenced such a proceeding to liquidate the affairs of the partnership, there is nothing to prevent the surviving partner from dealing with the partnership property as his own, and acting in good faith to make valid dispositions of it; * * * and if, in like good faith, with the acquiescence of the personal representatives of the deceased partner, he uses the firm property to continue the business on his own account and in his own name, he does it without other liability than to be held accountable to the estate of his deceased partner for a share of the profits, or, as we have seen, upon a bill filed for that purpose by the personal representatives of the deceased partner or a partnership creditor to wind up the firm business, and apply its assets to the payment of its debts. Any intermediate disposition of the property made in good faith, even although it may have been specifically a part of the partnership assets, and even if it has been applied to the payment of his individual obligations, will be valid and effectual, and, without circumstances showing an actual intention to defraud, cannot be treated as a fraud in law upon the partnership creditors."

In 1 Bates, Partn. § 540: "Each partner has the right to require that all the assets be applied to the payment of debts, for otherwise his own liability *in solido* for them all would be undiminished. This is a right which appertains to him personally, and not to the partnership creditors. In case the assets pass under the control of the courts for distribution, either by reason of bankruptcy, death, or suit for accounting and dissolution, not only will the rights of the partners to have the debts paid be carried out, but the court will subrogate the credits to this right, and treat it as an obligation, provided it had not been parted with by the partners at the time the court came into possession of the fund."

In 2 Bates, Partn. § 820, it is said: " While creditors have no lien nor claim upon the partnership assets other than any individual creditor has against his debtor's property, except as derived in consequence of the partner's equity, as will be seen, yet each partner has an equity to compel the application of the assets to the joint debts."

And in section 824: " As stated at the beginning of this chapter, the partnership creditors, except when they are given the benefit of the partner's equity, have of themselves no other claim than any creditor has on his debtor's property. The right of a partnership creditor to be paid has been extended in many jurisdictions beyond what the logic of its original foundation will warrant. The partners have jointly the same right of absolute disposition of their joint property that any individual has. They may sell it, pledge it, convert it into other forms, divide it up among themselves, devote it to the payment of debts, or part of the debts, or exercise other ownership over it, subject only to each other's rights, and to the operation of statutes forbidding voluntary conveyances to hinder and defraud creditors."

And these positions are sustained by numerous authorities both in England and the different states. See, also, Story, Partn. §§ 347, 358, 362, and notes. Further, to the point that creditors have no lien except through the partners, and that when the assets have been disposed of by the consent of the partners the equity of the individual partners has been extinguished, and no lien remains to the creditors, see *Hoxie v. Carr*, 1 Sum. 173; *Allen v. Center Val. Co.* 21 Conn. 130; *McDonald v. Beach*, 2 Blackf. 55; *Kistner v. Sindlinger*, 33 Ind. 114; *Harris v. Peabody*, 73 Me. 262; *Glenn v. Gill*, 2 Md. 1; *Locke v. Lewis*, 124 Mass. 1.

This, according to all the authorities, is the law as applicable to the creditors, the firm, and the individual members of the firm; and it will readily appear that the law supposed by the court to be applicable to the gar-

nishees would not have been correct if attempted to be applied on attachment proceedings by creditors against Livingston & Sickman; for, as between them, fraud *per se* could not be presumed.

Section 20, chapter 43, General Statutes, is as follows: " The question of fraudulent intent in all cases arising under the provisions of this title shall be deemed a question of fact, and not of law, nor shall any conveyance or charge be adjudged fraudulent against creditors or purchasers solely on the ground that it was not founded on a valuable consideration."

One who alleges fraud must clearly and distinctly prove the fraud he alleges. *Beatty v. Fishel*, 100 Mass. 448; *Klein v. Horine*, 47 Ill. 430; *Morgan v. Olvey*, 53 Ind. 6.

"In order to establish fraud, the true rule, in all courts, is to require such legal evidence as will overcome in the mind of the tribunal the legal presumption of innocence, and beget a belief of the truth of the allegation of fraud." *Marksbury v. Taylor*, 10 Bush, 519.

There is a wide distinction between fraud *per se* (a fraud at law) and fraud in fact. The first, as shown by the instructions, was assumed to exist and control. If, in this case, there was any question of fraud, it was a question of fraud in fact, depending upon the intention of the parties to be charged, and to be determined by the jury, on proper instructions, and not by the court. Bigelow, Fraud, 139; *Milne v. Henry*, 40 Pa. St. 352; *Twyne's Case*, 1 Smith, Lead. Cas. (5th ed.) 47, Amer. note.

The *bona fides* of the sale could, as has been shown, only have been tried in a proceeding to set it aside. "The general rule is that the garnishee is not chargeable unless the defendant could recover of him what the plaintiff seeks to secure by garnishment." Wap. Attachm. 202; Drake, Attachm. § 458. And this rule has been adopted and decided to be the law in the federal courts, and in the courts of nearly if not all the states. This

rule is subject to this exception: "Where the garnishee is in possession of *effects* of the defendant under a fraudulent transfer from the latter, there, though the defendant would have no claim against the garnishee, yet a creditor of the defendant can subject the effects in the garnishee's hands to his attachment." Drake, Attachm. § 458; Wap. Attachm. 215. The reason is obvious: The defendant, by making a fraudulent transfer, precludes himself from proceeding at law to recover the value, while the creditor is not precluded.

The court and counsel for appellees seem to have misapprehended our statute, and the proper application of the exception above stated. Under our statute, and it is substantially the same in nearly all the states, garnishment will be effective — *First*, where the garnishee is *indebted* to the defendant either in money or property; *second*, when the garnishee is in possession and charge of, or has under his control, any property, *effects*, goods, chattels, rights, credits or choses in action of the defendant. Gen. St. p. 518, § 1554; Code 1883, § 104.

It will be observed that the two are entirely distinct and separable. The language of the exception and the authorities confine it entirely to the second. It is "effects" in the hands of the garnishee, as contradistinguished from the debt payable in money or property. In this case the proceeding was under the first clause, for a debt payable in money, while the law supposed to apply was only applicable to the second clause, where the garnishee had effects of the defendant, where by reason of the fraud no title had passed to the effects, and they could be subjected to attachment as the property of the defendant, when he had precluded himself from asserting his legal ownership.

There is no evidence whatever of an intended fraud. It could only have been assumed or inferred from the supposed illegal application of the personal accounts to the payment of the notes. The fraud contemplated in,

and to be prevented by, law, is the illegal disposition of property by transfer, to place it beyond the reach of the creditor, with the expectation of subsequently deriving some benefit himself from it or its proceeds. Without such intention or expectation, there could be no motive. Section 11, chapter 43, General Statutes, page 509, is as follows: "All deeds of gift, all conveyances, and all transfers or assignments, verbal or written, of goods, chattels, or things in action, made in trust for the use of the person making the same, shall be void as against the creditors, existing, of such person."

By no possibility, in this case, could the indorsement of the amount upon the notes, and canceling so much of the indebtedness, have inured to the benefit of the defendants. It was clearly against their interest, and can only be explained as being done in pursuance of the agreement made at the time of the purchase.

It is assigned for error that the court refused to allow the witness Jonathan Sickman to testify further as to what the contract between the parties was in regard to the individual accounts of the members of the old firm. We think this was not an error, not on the ground on which it was presumably put by the court, that the indorsements were fraudulent *per se*, but from the fact that the inquiry was unimportant, being one that could not legally arise in a controversy between creditors and garnishees, under the circumstances and facts as before shown. We do not intend to be understood as holding that the debts of individual partners, due to the firm of which they are members, can or cannot be assigned so as to pass as assets of the firm by a sale. A case might arise where it would become necessary to determine the question; but, in our view, it is not necessary to determine it here. There were no intervening suits. The property was not in the custody of the law. The parties to the contract all united in the transaction, and its conclusion was mutually satisfactory. A mutual mistake of the parties in

regard to the law, if one was made, could not vitiate the transaction. The creditors, by the course pursued, as shown above, had ratified it, and could not raise and adjudicate the question of legality in a proceeding against garnishees to recover a supposed debt. If, as appears, the accounts were sold, and the amounts were to be, and were, deducted from the purchase price, then they became and were a part of the consideration for which the notes were given, and when indorsed were a payment *pro tanto.* To hold otherwise would be to make a new contract, never contemplated by the parties, and increase the purchase price over $3,000. To arbitrarily say that the individual accounts could not be regarded in law as assets, and transferred,— hence, that the indorsements of the amounts upon the notes were illegal, and no payment,— and that the garnishees were liable for the amounts to the attaching creditors, would be to create a debt for that amount due the defendants, which creditors could appropriate, never contemplated by defendants or garnishees; one that had been satisfactorily settled and discharged by the only parties legally concerned; a debt in favor of defendants that they could in no wise enforce as against the garnishees.

We think the learned judge erred in his instructions to the jury, particularly in those from 7 to 13, both inclusive, given on the part of plaintiffs. They were inapplicable in the case presented. They are based upon the mistaken theory that the garnishees were the trustees of the creditors of the old firm, and as such chargeable with the proper application of the funds. As shown, the position is not tenable. It was a purchase and sale in which creditors in no way participated, nor in any way attempted to interfere, by suit or otherwise, until the whole purchase price had been paid, and the transaction closed to the mutual satisfaction of all the parties having a legal right to question it. It follows that the learned judge was mistaken, not as to the law

controlling the application of partnership funds, but in applying in this case the principles of law only applicable to the funds, assets, or effects of partnership, when, by proper suits, they were in the custody of the court for distribution.

The judgment should be reversed and the garnishees discharged.

RICHMOND and PATTISON, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion, the judgments are reversed, and the causes remanded, with directions to discharge the garnishees.

*Reversed.*

MR. JUSTICE ELLIOTT not sitting.